## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF OHIO

| | | |
|---|---|---|
| PAMELA J. CROWE, | ) | CASE NO. 3:18-cv-02400 |
| | ) | |
| Plaintiff, | ) | JUDGE JACK ZOUHARY |
| | ) | |
| v. | ) | MAGISTRATE JUDGE |
| | ) | KATHLEEN B. BURKE |
| COMMISSIONER OF SOCIAL | ) | |
| SECURITY ADMINISTRATION, | ) | |
| | ) | **REPORT AND RECOMMENDATION** |
| Defendant. | ) | |

Plaintiff Pamela J. Crowe ("Plaintiff" or "Crowe") seeks judicial review of the final decision of Defendant Commissioner of Social Security ("Commissioner") denying her application for Disability Insurance Benefits ("DIB").  This Court has jurisdiction pursuant to 42 U.S.C. § 405(g).  This matter has been referred to the undersigned Magistrate Judge for a Report and Recommendation pursuant to Local Rule 72.2.

For the reasons explained herein, the undersigned recommends that the Court **AFFIRM** the Commissioner's decision.

### I.  Procedural History

Crowe protectively filed an application for DIB on October 27, 2014, alleging a disability onset date of September 8, 2014.[1]  Tr. 23, 85, 101, 213-219, 237.  She alleged disability due to hip replacement, back pain, depression and anxiety.  Tr. 85, 115, 122, 241.   After initial denial

---

[1] The Social Security Administration explains that "protective filing date" is "The date you first contact us about filing for benefits. It may be used to establish an earlier application date than when we receive your signed application."  http://www.socialsecurity.gov/agency/glossary/ (last visited 9/16/2019).

1

by the state agency (Tr. 115-118) and denial upon reconsideration (Tr. 122-128), Crowe requested a hearing (Tr. 129-130).  A hearing was held before an Administrative Law Judge ("ALJ") on July 27, 2017.  Tr. 37-81.

On September 22, 2017, the ALJ issued a partially favorable decision.  Tr. 17-35.  The ALJ determined that Crowe was not disabled prior to April 1, 2017, but became disabled on that date and continued to be disabled through the date of the decision.  Tr. 21, 31.  As of April 1, 2017, the ALJ found that Crowe had an additional severe impairment of right peroneal neuropathy.  Tr. 23.  Crowe requested review of the ALJ's decision by the Appeals Council.  Tr. 211-212.  On August 14, 2018, the Appeals Council denied Crowe's request for review, making the ALJ's decision the final decision of the Commissioner.  Tr. 1-6.

## II. Evidence

Since the ALJ found Crowe disabled as of April 1, 2017, the period at issue in this appeal is September 8, 2014, her alleged onset date, through March 31, 2017.  Crowe raises only one argument in this appeal.  She contends that the ALJ erred at Step Three by finding that her impairments did not meet or equal Listing 1.02A.  Doc. 12, Doc. 16.  Thus, the evidence summarized herein is generally limited to evidence pertaining to her physical impairments.

### A.     Personal, educational, and vocational evidence

Crowe was born in 1963.  Tr. 213.  At the time of the hearing, Crowe was separated.  Tr. 47.  She was living in a house with her twenty-one-year old son.  Tr. 47-48.  Her son was not attending school or working.  Tr. 48.  The house had three floors, which included the basement.  Tr. 47, 67.  Crowe has a 12th grade education.  Tr. 45.  Crowe worked in the past as a nurse's aide.  Tr. 45-46, 71.  Crowe also worked part-time at a gas station that had a deli.  Tr. 46-47.  She has not worked since September 2014.  Tr. 45, 241.

2

**B.**     **Medical evidence**

   **1.  Treatment history**

Crowe had right hip replacement surgery in 2010.  Tr. 522.  She has also had problems with her knees, hands, back and feet.  Tr. 370, 522.  On June 10, 2015, Crowe saw Dr. Mark Fenzl, D.O., at Forest Community Health Center for arthritis/joint pain.  Tr. 375-378.  Crowe complained of swelling in her left knee and pain when doing steps.  Tr. 375.  She had a knot on the front of her left knee and on the second digit knuckle of her right hand.  Tr. 375.  Crowe explained that the onset of the pain in her left knee and right hand had been 12 months prior and the symptoms were worsening.  Tr. 375.  She indicated that her symptoms were intermittent, and her symptoms were relieved with nonsteroidal anti-inflammatory drugs.  Tr. 375.  Crowe also noted chronic lumbar back pain, a leg length discrepancy, history of right hip surgeries; right foot pain; depression; and peripheral neuropathy.  Tr. 375.  With respect to the peripheral neuropathy, Dr. Fenzl noted that Crow had right foot drop and decreased sensation in her right foot.  Tr. 375.  Physical examination showed normal gait and station and normal posture.  Tr. 377.  Crowe exhibited fullness on the lateral aspect of her left knee and second MCP joint of her right hand.  Tr. 377.  Crowe did not have lumbar spinous process tenderness.  Tr. 377.  Dr. Fenzl ordered various x-rays and referred Crowe to Dr. Mehta for an evaluation for rheumatoid arthritis.  Tr. 377.

Upon Dr. Fenzl's referral, on June 12, 2015, x-rays were taken of Crowe's feet, hands, left knee, and lumbar spine.  Tr. 370.  The impression from the x-rays was mild tricompartmental degenerative changes in the knee; mild degenerative changes in the right midfoot and right thumb; grade 1 degenerative anteriolisthesis L4 and L5 with facet arthritis; and mild degenerative changes in the lumbar spine with endplate spurring; and degenerative changes in

the lower dorsal spine.  Tr. 370.  A scanogram was also performed on June 12, 2015, to evaluate Crowe's leg length.  Tr. 371.  The scanogram showed that Crowe's left leg was one centimeter longer than her right leg.  Tr. 371.

Upon Dr. Fenzl's referral, on July 16, 2015, Crowe saw a rheumatologist, Dr. Madhu Mehta, M.D., for her complaints of stiffness and pain in her knees and back.  Tr. 389-391.  Dr. Mehta noted Crowe's prior surgery following a motor vehicle accident when she was nine years old and her more recent total hip arthroplasty that occurred five years prior.  Tr. 389.  Crowe indicated that her more recent hip surgery had resolved her right hip pain but she had worsening low back pain since the surgery.  Tr. 389.  She was using ibuprofen 1200 mg, three times each day with some relief.  Tr. 389.  Crowe had not had an epidural and she had not tried aqua therapy.  Tr. 389.  On physical examination, Crowe exhibited normal range of motion in her back and in all joints.  Tr. 390.  Crowe's muscle strength was normal in all muscle groups and she had normal coordination and gait.  Tr. 390.  There was moderate paravertebral muscle tenderness noted in Crowe's back; bilateral knee crepitus, left greater than right; and obvious osteoarthritic changes in the hands, worse in the right second MCP joint.  Tr. 390.  Dr. Mehta assessed osteoarthritis at multiple sites with no evidence of rheumatoid arthritis, gout, or pseudogout.  Tr. 391.  Dr. Mehta encouraged weight loss, noting that obesity can worsen joint symptoms.  Tr. 391.  Dr. Mehta recommended smoking cessation, noting that tobacco use can accelerate osteoarthritic joint damage.  Tr. 391.  Dr. Mehta recommended follow up in two months.  Tr. 391.

During 2015 and 2017, Crowe continued to see physicians at Forest Community Health Center.  Tr. 407-422.  During a December 11, 2015, visit, Crowe complained of right hip pain with groin radiation.  Tr. 408.  Crowe did not report back pain or joint stiffness.  Tr. 408.  On

4

physical examination, Crowe exhibited normal posture and gait.  Tr. 408.  Crowe exhibited

normal strength, tone and range of motion without pain in her extremities.  Tr. 409.  With regard

to the right hip, Dr. Paul D. Wesson II, D.O., noted that Crowe appeared to have good strength

and range of motion but Crowe complained of occasional pain with groin radiation. Tr. 409.

Lumbar spine examination showed left lumbar and SI pain with palpable spasm and decreased

range of motion in all planes. Tr. 409.  Dr. Wesson started Crowe on Zanaflex for her lumbar

sprain and had an x-ray taken of Crowe's right hip.  Tr. 409.

On February 5, 2016, Crowe saw Dr. Wesson for review of x-rays.  Tr. 410.  She was

requesting a letter stating her disability status for food stamps and she was requesting therapy.

Tr. 410.  Crowe had been referred to pain management but she was unable to go due to

transportation problems.  Tr. 410.  She had been unable to take Gabapentin because it was

causing dizziness.  Tr. 410.  Crowe complained of intermittent sharp and burning pain in her

lower back, which was worse with bending or twisting.  Tr. 411.  Examination of the extremities

showed normal strength and tone.  Tr. 411.  On examination of the spine, ribs and pelvis, there

was midline pain at the lower lumbar area, palpable spasm and decreased range of motion in all

planes.  Tr. 411.  For Crowe's lumbar sprain, Dr. Wesson started Crowe on Diclofenac Sodium.

Tr. 412.

Crowe saw Dr. Wesson on March 4, 2016, for a one-month check-up.  Tr. 413-415.

Crowe had not started therapy due to transportation issues.  Tr. 413.  She relayed that her legs

were occasionally going "to sleep" while sitting.  Tr. 413.  Her pain was exacerbated by

ascending or descending steps.  Tr. 413.  Crowe complained of left lumbar pain and associated

decreased range of motion.  Tr. 414.  Examination of the extremities showed normal strength and

tone.  Tr. 414.  On examination of the spine, ribs and pelvis, there was midline pain to palpation

with decreased range of motion, flexion 45 degrees and extension 0 degrees, and left paralumbar muscle pain with palpable spasm. Tr. 414. For Crowe's lumbar sprain, Dr. Wesson continued her on Zanaflex and Diclofenac Sodium and started her on a Medrol pack. Tr. 415. Dr. Wesson noted that Crowe should be provided a notice indicating that she had a "disability case in process." Tr. 415.

On September 2, 2016, Crowe saw Dr. Wesson with reports of left knee pain, which had occurred without any known injury. Tr. 416-419. Crowe's symptoms included knee pain, swelling and difficulty bearing weight. Tr. 416. She described the pain as burning and moderate in severity. Tr. 416. Her symptoms were relieved with rest and non-opioid analgesics. Tr. 416. Crowe noted that her symptoms had improved with the recent initiation of Diclofenac. Tr. 416. On review of systems, Crowe indicated that her knee pain and stiffness was worse in the left knee than in the right. Tr. 417. On examination, there was normal strength and tone in all extremities. Tr. 418. Dr. Wesson noted "[d]ecreased ROM in all planes, limited by paiin [sic] and swelling, trace peripatellar effusion today, point pain at inferior patellar area (tibial tuberosity), no obvious evidence of ligamentous laxity." Tr. 418. For strain of left knee, Dr. Wesson modified Crowe's Zanaflex prescription and restarted Diclofenac Sodium. Tr. 419. He recommended that Crowe follow up with Dr. Fritz (ortho). Tr. 419.

Upon Dr. Wesson's request, Crowe saw Dr. Aaron Michael Fritz, D.O., on September 19, 2016, for her left knee pain. Tr. 427-428. Crowe's pain was described as moderate and fluctuating. Tr. 427. Dr. Fritz noted that "[p]ertinent negatives" included "no inability to bear weight, loss of motion, numbness or tingling." Tr. 427. Crowe's symptoms were aggravated by movement, palpation and weight bearing. Tr. 427. NSAIDs provided Crowe with mild relief. Tr. 427. Dr. Fritz observed that Crowe's gait was antalgic on the right; her posture was normal;

her cervical, dorsal and lumbar spines were supple and stable; her bilateral hips, feet and ankles were non-tender, supple and stable; her right knee was non-tender, supple and stable.  Tr. 428. Dr. Fritz noted "Reflexes equal symmetric and physiologic bilateral upper and lower extremities." Tr. 428.  There were no sensory or motor deficits C5-T1 and L2-S1 bilaterally; and she had distal pulses and capillary refill bilaterally in the upper and lower extremities.  Tr. 428. In the left knee, there was no effusion or masses; there was positive midline joint tenderness; the extensor mechanism was intact; AROM was 0-110 with positive crepitus, negative Lachman, and negative anterior and posterior drawer test; there was negative varus or valgus instability at 0, 30 and 90 degrees; and there was equivocal MacMurrays.  Tr. 428.  Dr. Fritz also observed right foot drop.  Tr. 428.  Dr. Fritz noted that an x-ray of the left knee showed moderate patellofemoral osteoarthritis with mild medial osteoarthritis.  Tr. 428.  Dr. Fritz's assessment was osteoarthritis of the left knee.  Tr. 428.  He recommended that Crowe wear an open knee sleeve on her left knee when ambulating.  Tr. 428.  He administered a corticosteroid injection.  Tr. 428. Dr. Fritz also recommended that Crowe use the AFO[2] that she had for her right lower extremity. Tr. 428.

On November 29, 2016, Crowe was seen by physical therapist Megan McCurley for an evaluation due to her knee pain.  Tr. 522-524.  Ms. McCurley noted that Crowe presented with decreased strength, balance and functional activity tolerance.  Tr. 524.  She recommended physical therapy for Crowe, twice per week for six weeks.  Tr. 524.  Ms. McCurley indicated that Crowe's rehab potential was good.  Tr. 524.

---

[2] "AFO" likely refers to an ankle-foot orthosis, a brace "worn on the lower leg and foot to support the ankle, hold the foot and ankle in the correct position and correct foot drop." https://www.medicinenet.com/script/main/art.asp?articlekey=2262 (last visited 9/16/2019).

During a February 10, 2017, visit with Dr. Wesson, Crowe requested a "slip saying she has a disability case in progress." Tr. 420.  Crowe's cholesterol and mental health issues were discussed.  Tr. 420.  On review of systems, no pain was reported.  Tr. 421.  Examination of Crowe's extremities showed normal strength and tone.  Tr. 422.

On February 27, 2017, Crowe was seen as a new patient at Blanchard Valley Neurological Associates for complaints of low back pain.  Tr. 610-614.  Crowe described progressively worsening left-sided lumbosacral pain.  Tr. 611. She stated that her pain was intermittent but was worse with standing, bending or twisting and she had increased pain with sitting for extended periods.  Tr. 611.  Crowe denied lower extremity radicular pain but noted intermittent numbness/paresthesias throughout her posterior calves bilaterally and her right foot, especially when sitting.  Tr. 611.  On examination, Crowe exhibited diffuse lumbar paravertebral myospasms; no lumbar neurotension signs; right dorsiflexor weakness at 3+ to 4/5 which Crowe stated was chronic; absent right Achilles reflex; and no hyperreflexia or myelopathic features. Tr. 614.  New MRIs of the spine were ordered along with a lower extremity EMG study.  Tr. 614.  Crowe was referred to physical therapy.  Tr. 614.

### 2.  Opinion evidence

There are no opinions from treating sources.

On June 22, 2015, Crowe saw Dr. B.T. Onamusi, M.D., for a consultative examination. Tr. 379-387.  On examination, Dr. Onamusi observed that Crowe walked with a mild limp.  Tr. 385.  She declined squatting and had difficulty walking on her heels and toes.  Tr. 385. She had no difficulty transferring on or off the exam table.  Tr. 385.  She did not use an assistive device to ambulate or transfer.  Tr. 385.  Crowe declined range of motion testing in her lumbar spine. Tr. 382, 385.  Other range of motion testing was normal with the exception of some reduced

range of motion in the right ankle.  Tr. 381-383.  Dr. Onamusi observed areas of mild tenderness involving the MCP joint of the right index finger; mild diffuse bilateral knee joint tenderness; and tenderness involving the posterior lateral aspect of the right hip.  Tr. 386.  Dr. Onamusi assessed "Chronic lower back and polyarticular pain status-post right total hip replacement. Claimant probably has polyarticular degenerative disease in the extremities especially in the knees and the fingers."  Tr. 386.  Dr. Onamusi opined that Crowe was capable of functioning at sedentary to light physical demand levels.  Tr. 386.

On August 15, 2015, state agency reviewing physician Anne Prosperi, D.O., completed a physical RFC assessment.  Tr. 96-98.  Dr. Prosperi opined that Crowe had the RFC to occasionally lift and/or carry 20 pounds; frequently lift and/or carry 10 pounds; stand and/or walk for a total of about 6 hours in an 8-hour workday; sit for a total of about 6 hours in an 8-hour workday; limited to frequent pushing, pulling or using foot controls with the right lower extremity; never climb ladders/ropes/scaffolds; occasionally climb ramps/stairs, stoop, kneel, crouch and crawl; frequently balance; and must avoid all exposure to unprotected heights due to leg inequality and mild limp noted at times.  Tr. 97-98.

Upon reconsideration, on November 24, 2015, state agency reviewing physician Gail Mutchler, M.D., reached the same RFC findings as Dr. Prosperi.  Tr. 108-111.

## C.    Hearing testimony

### 1.    Plaintiff's testimony

Crowe was represented at and testified at the hearing.  Tr. 44-69.  Crowe explained that she has problems going up and down stairs – she does not have the strength and it hurts.  Tr. 47-48.  She also has a hard time getting out of a car due to having to push her body up.  Tr. 48, 60-61.  Crowe indicated that she did not feel that her weight negatively impacted her ability to do

things.  Tr. 48.  Crowe described the pain in her back, stating that the pain shoots down the left side and into her thigh at times.  Tr. 49-50.  The level of her back pain varies depending on what she is doing.  Tr. 49.

Crowe also has problems with both her knees but indicated that her left knee is worse than the right.  Tr. 50.  Her knee swells and is very painful.  Tr. 50.  Crowe has had injections in her knee.  Tr. 50.  She relayed that the first injection helped her a lot – she could manage steps much better.  Tr. 50.   Later injections did not prove to be as helpful and she noted that a gel shot that she received actually made her knee swell up and look weird ever since receiving it.  Tr. 50-51.

Since childhood, Crowe had foot drop because of an accident but she indicated that the foot drop has gotten worse and she started having constant pain in her right foot when she was working.  Tr. 51.  At home, Crowe usually just wears slippers.  Tr. 51, 53.  Crowe does not like to wear shoes because it seems to hurt more with shoes.  Tr. 68.  The more she is on her feet, the more they hurt so she tries not to be on her feet often.  Tr. 53-54.  Crowe's right leg is weak and her left leg hurts.  Tr. 62-63.  Crowe also has numbness in her right leg.  Tr. 68, 69.  Sitting causes the numbness in her leg to occur more frequently.  Tr. 68.

Crowe also has problems with her hips.  Tr. 52.  She had a total hip replacement on the right.  Tr. 52.  Since the surgery, walking far does not bother her hip that much.  Tr. 52.  Crowe indicated that she felt the hip replacement was a blessing.  Tr. 52.  Crowe explained that her back and knees bother her more than her hip.  Tr. 52.

Crowe has arthritis in her hands and in an index finger.  Tr. 52.  Her fingers lock up on her occasionally, which causes her problems with holding or grasping items.  Tr. 52.  She is usually able to do some stretching to deal with her fingers locking up.  Tr. 53.

10

Crowe takes anti-inflammatories and Neurontin.  Tr. 54, 55-56.  Crowe takes prescription Ibuprofen – 800 mg.  Tr. 56.  The Neurontin makes Crowe tired but her doctor wants her to continue taking it.  Tr. 54, 55.  However, Crowe does not feel that it helps.  Tr. 54.

Crowe has some problems doing household chores.  Tr. 56.  Her back starts to hurt after doing dishes in the sink for a short time.  Tr. 56.  She can vacuum and sweep but it causes her pain on her left side.  Tr. 56.  She can change the bed sheets but it causes her pain because of the bending.  Tr. 56. Her washer and dryer are in the basement so it is hard for her to do laundry.  Tr. 56-57.  She is able to cook by sitting for some things and standing for other things.  Tr. 57.

Crowe usually spends her day sitting, lying down, putting her legs up, babysitting her granddaughter, who was nine years old at the time of the hearing.  Tr. 57.  Her granddaughter helps her with a lot of things that require bending or Crowe's son will help her.  Tr. 57.  Crowe babysits her granddaughter during the summer while her mother – Crowe's daughter – is at work.  Tr. 57.  Sometimes during the school year, Crowe will help get her granddaughter to or from school if she is needed due to her daughter's work schedule.  Tr. 58.  Crowe plays electronic games with her granddaughter and watches television or movies with her granddaughter.  Tr. 59, 60.  They garden together.  Tr. 59-60.  Crowe has a vegetable garden.  Tr. 59-60.  Crowe's best friend/sister-in-law lives about a half a block from Crowe.  Tr. 58.  Crowe does not have a car so she walks to her friend's house.  Tr. 58.  After walking over, Crowe usually sits for about 10-15 minutes.  Tr. 64.  Crowe usually visits her friend daily to take a shower because Crowe does not have hot water.  Tr. 64.  Crowe sometimes has dinner with her friend and her friend's husband, who is Crowe's brother.  Tr. 58, 64.  After returning home from her friend's house, Crowe sometimes has to sit with her feet up because her knee is swollen and sometimes it does not take her long to rejuvenate.  Tr. 65.  Crowe usually elevates her legs a little

11

bit every day because of swelling in her knee.  Tr. 65.  Crowe's bedroom is on the first floor and
there is a bathroom on that floor as well so she generally spends most of her day on the first
floor.  Tr. 67.

Crowe estimated being able to stand for about 30-45 minutes.  Tr. 61.  She thinks she
would not be able to walk a half a mile without having to stop.  Tr. 61.  Crowe estimated being
able to sit about an hour before needing to stand up and stretch.  Tr. 61-62.  She estimated being
able to carry about 10 pounds a short distance.  Tr. 62, 63.  Whether she is getting two items or a
lot of items, when Crowe goes grocery shopping she always uses a shopping cart.  Tr. 63.

### 2.  Vocational expert's testimony

Vocational expert ("VE") Sandra Steele testified at the hearing.  Tr.  69-79.  The VE
described Crowe's past work as a nurse's aide as an SVP 4, medium level job that Crowe
performed at the heavy level.[3]  Tr. 71, 74, 278.

For her first hypothetical, the ALJ asked the VE to consider a hypothetical individual of
Crowe's age and education and with her past work experience as a nurse's aide who can perform
less than a full range of light work and who can lift, carry, push and pull 20 pounds occasionally
and 10 pounds frequently, sit for 6 out of 8 hours, stand and/or walk for 6 out of 8 hours; must
have the ability to alternate between sitting and standing at her option every 30 minutes for 1 to 2
minutes so long as the individual is not off-task or does not have to leave the vicinity or work
station; can never climb ladders, ropes or scaffolds, kneel, or crawl; can occasionally climb
ramps and stairs, balance, crouch and stoop; can frequently operate hand controls and handles

---

[3] SVP refers to the DOT's listing of a specific vocational preparation (SVP) time for each described occupation.
Social Security Ruling No. 00-4p, 2000 WL 1898704, *3 (Dec. 4, 2000).   "Using the skill level definitions in 20
CFR 404.1568 and 416.968, unskilled work corresponds to an SVP of 1-2; semi-skilled work corresponds to an SVP
of 3-4; and skilled work corresponds to an SVP of 5-9 in the DOT."  Id.

with the bilateral upper extremities; can occasionally reach overhead with the bilateral upper extremities; can occasionally[4] push and/or pull or operate foot controls with the bilateral lower extremities; and cannot walk on uneven terrain or work around unprotected heights or unprotected moving mechanical machinery.  Tr. 72.  The VE indicated that the described individual would be unable to perform Crowe's past work but there were light, unskilled jobs that the described individual could perform, including (1) bench assembler; (2) packer; and (3) small parts assembler.  Tr. 73.  The VE provided job incidence data for each of the identified jobs, noting that the numbers were reduced to numbers that were consistent with the hypothetical provided.  Tr. 73.

For her second hypothetical, the ALJ asked the VE to consider the first hypothetical but to add that the individual cannot walk for more than 15 minutes at one time.  Tr. 74.  The VE indicated that her answer to the first hypothetical would not change.  Tr. 74.

For her third hypothetical, the ALJ asked the VE to consider the first two hypotheticals but with a reduction in the amount of walking/standing the individual could do.  Tr. 74.  Instead of being able to stand/walk 6 out of 8 hours, the individual would be able to stand/walk 4 out of 8 hours.  Tr. 74.  The VE indicated that that change would not alter her prior answer in response to the first two hypotheticals.  Tr. 74.

The VE also provided testimony regarding regular breaks, on-task requirements and acceptable absences required in order to perform work on a regular and continuing basis.  Tr. 75-76.

---

[4] The record is a little unclear as to whether the hypothetical stated frequent or occasional push/pull or operation of foot controls with the bilateral lower extremities.  Tr. 72.  However, Crowe does not take issue with the VE hypotheticals.

13

The ALJ also asked the VE to consider the first three hypotheticals but to add that the individual would need the ability to elevate her legs six inches occasionally throughout the workday.  Tr. 77.  The VE indicated that, with that additional requirement, the jobs previously identified would be precluded as well as many other jobs.  Tr. 77.

Crowe's counsel then asked the VE to consider the first hypothetical but to add that, when the individual is alternating between sitting and standing, she would need five minutes of stretching and walking around.  Tr. 77-78.  The VE indicated that there would be no competitive work.  Tr. 78.  Crowe's counsel also asked whether the jobs identified could be performed if one day the individual sits all day for 8 hours and another day the individual stands all day for 8 hours.  Tr. 78.  The VE indicated that, if a person sat all day, the individual would not be able to perform the jobs.  Tr. 79.  Assuming a person had the ability to stand all day, the VE did not see any reason why the individual could not perform the jobs.  Tr. 79.

### III. Standard for Disability

Under the Act, 42 U.S.C § 423(a), eligibility for benefit payments depends on the existence of a disability.  "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).  Furthermore:

> [A]n individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy[5] . . . .

---

[5] "'[W]ork which exists in the national economy' means work which exists in significant numbers either in the region where such individual lives or in several regions of the country."  42 U.S.C. § 423(d)(2)(A).

42 U.S.C. § 423(d)(2).

In making a determination as to disability under this definition, an ALJ is required to follow a five-step sequential analysis set out in agency regulations.  The five steps can be summarized as follows:

1. If the claimant is doing substantial gainful activity, he is not disabled.

2. If the claimant is not doing substantial gainful activity, his impairment must be severe before he can be found to be disabled.

3. If the claimant is not doing substantial gainful activity, is suffering from a severe impairment that has lasted or is expected to last for a continuous period of at least twelve months, and his impairment meets or equals a listed impairment, the claimant is presumed disabled without further inquiry.

4. If the impairment does not meet or equal a listed impairment, the ALJ must assess the claimant's residual functional capacity and use it to determine if the claimant's impairment prevents him from doing past relevant work.  If the claimant's impairment does not prevent him from doing his past relevant work, he is not disabled.

5. If the claimant is unable to perform past relevant work, he is not disabled if, based on his vocational factors and residual functional capacity, he is capable of performing other work that exists in significant numbers in the national economy.

20 C.F.R. § 404.1520; *see also Bowen v. Yuckert*, 482 U.S. 137, 140-42, 96 L. Ed. 2d 119, 107 S. Ct. 2287 (1987).  Under this sequential analysis, the claimant has the burden of proof at Steps One through Four.  *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997).  The burden shifts to the Commissioner at Step Five to establish whether the claimant has the RFC and vocational factors to perform work available in the national economy.  *Id.*

# IV. The ALJ's Decision

In her September 22, 2017, decision, the ALJ made the following findings:[6]

1.  Crowe met the insured status requirements through December 31, 2019. Tr. 23.

2.  Crowe has not engaged in substantial gainful activity since the alleged onset date.  Tr. 23.

3.  Since the alleged onset date of disability, September 8, 2014, Crowe has had the following severe impairments: obesity; lumbar disc disease; bilateral osteoarthritis; right hip remote fracture with internal fixation, revision, and total hip arthroplasty with osteitis pubis; bilateral hands and feet osteoarthritis.  As of April 1, 2017, Crowe also had right peroneal neuropathy.  Tr. 23.

4.  Since the alleged onset date of disability, September 8, 2014, Crowe has not had an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments.  Tr. 24.

5.  Prior to April 1, 2017, the date Crowe became disabled, Crowe had the RFC to perform light work except she could sit for 6 hours out of an 8-hour workday and stand and/or walk for 4 hours out of an 8-hour workday; she could not walk for more than 15 minutes at one time; she must have the ability to alternate between sitting and standing, at her option, every 30 minutes for 1-2 minutes so long as she was not off task or had to leave the vicinity of the workstation; she could never climb ladders, ropes, or scaffolds, kneel, or crawl; and could occasionally climb ramps and stairs, balance, crouch, and stoop; she could frequently operate hand controls and handle with the bilateral upper extremities; she could occasionally reach overhead with the bilateral upper extremities; she could occasionally push and/or pull or operate foot controls with the bilateral lower extremities; and she could not walk on uneven terrain or work around unprotected heights or unprotected moving mechanical machinery.  Tr. 24-28.

6.  Beginning on April 1, 2017, Crowe had the RFC to perform sedentary work except she could not walk for more than 15 minutes at one time; she must have the ability to alternate between sitting and standing, at her option, every 30 minutes for 1-2 minutes so long as she was not off task or had to leave the vicinity of the workstation; she could never climb ladders,

---

[6] The ALJ's findings are summarized.

ropes, or scaffolds, kneel, or crawl; and could occasionally climb ramps and stairs, balance, crouch, and stoop; she could frequently operate hand controls and handle with the bilateral upper extremities; she could occasionally reach overhead with the bilateral upper extremities; she could occasionally push and/or pull or operate foot controls with the bilateral lower extremities; and she could not walk on uneven terrain or work around unprotected heights or unprotected moving mechanical machinery. Tr. 28-29

7.  Since September 8, 2014, Crowe has been unable to perform any past relevant work.  Tr. 29.

8.  Prior to the established onset date, Crowe was an individual closely approaching advanced age and Crowe's age category has not changed since the established disability onset date.  Tr. 30.

9.  Crowe has at least a high school education and can communicate in English.  Tr. 30.

10.  Prior to April 1, 2017, transferability of job skills is not material to the determination of disability.  Tr. 30.  Beginning on April 1, 2017, Crowe was not able to transfer job skills to other occupations. Tr. 30.

11.  Prior to April 1, 2017, considering Crowe's age, education, work experience and RFC, there were jobs that existed in significant numbers in the national economy that Crowe could perform, including assembler, packer, and small parts inspector.  Tr. 30-31.

12.  Beginning on April 1, 2017, considering Crowe's age, education, work experience and RFC, there were no jobs that existed in significant numbers in the national economy that Crowe could perform.  Tr. 31.

Based on the foregoing, the ALJ determined that Crowe was not disabled prior to April 1, 2017, but became disabled on that date and has continued to be disabled through the date of the decision.  Tr. 31.

17

## V.     Law & Analysis

### A.     Standard of review

A reviewing court must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record.  42 U.S.C. § 405(g); *Wright v. Massanari*, 321 F.3d 611, 614 (6th Cir. 2003).  "Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Besaw v. Sec'y of Health & Human Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992) (quoting *Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989).  The Commissioner's findings "as to any fact if supported by substantial evidence shall be conclusive."  *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006) (citing 42 U.S.C. § 405(g)).

### B.     The undersigned recommends that the Court AFFIRM the Commissioner's decision

Crowe presents one argument in this appeal.  Crowe contends that the ALJ failed at Step Three to properly evaluate whether her impairments met or equaled Listing 1.02A.  Doc. 12, pp. 6-9, Doc. 16, pp. 2-3.

A claimant who is found to have an impairment that meets or medically equals a Listing at Step Three is entitled to benefits regardless of an ALJ's conclusions at Steps Four or Five. *Reynolds v. Comm'r of Soc. Sec.*, 424 Fed. Appx. 411, 416 (6th Cir. 2011).  Thus, the Sixth Circuit has found that an ALJ needs to evaluate evidence and compare it to the listing in order to allow for meaningful judicial review.  *Id.*  Yet, there is no is no heightened articulation standard imposed on an ALJ at Step Three.  *Bledsoe v. Barnhart*, 165 Fed. Appx. 408, 411 (6th Cir.

18

2006).  And, lack of analysis at Step Three may not be cause for reversal where the decision

includes findings to support the ALJ's decision and/or where a claimant has not shown that her

impairments met or equaled the severity of a listing.  *Forrest v. Comm'r of Soc. Sec.*, 591 Fed

Appx. 359, 366 (6th Cir. 2014).

> Listing 1.02

Listing 1.02A states,

> 1.02 Major dysfunction of a joint(s) (due to any cause): Characterized by gross
> anatomical deformity (e.g., subluxation, contracture, bony or fibrous ankylosis,
> instability) and chronic joint pain and stiffness with signs of limitation of motion
> or other abnormal motion of the affected joint(s), and findings on appropriate
> medically acceptable imaging of joint space narrowing, bony destruction, or
> ankylosis of the affected joint(s). With:
>
> A. Involvement of one major peripheral weight-bearing joint (i.e., hip, knee, or
>    ankle), resulting in inability to ambulate effectively, as defined in 1.00B2b;[7]

20 C.F.R. Pt. 404, Supbt. P, App.1.

> What is meant by an inability to ambulate effectively, is explained as follows in 1.00B2b:
>
> (1) Definition. Inability to ambulate effectively means an extreme limitation of the
>     ability to walk; i.e., an impairment(s) that interferes very seriously with the
>     individual's ability to independently initiate, sustain, or complete activities.
>     Ineffective ambulation is defined generally as having insufficient lower
>     extremity functioning (see 1.00J) to permit independent ambulation without the
>     use of a hand-held assistive device(s) that limits the functioning of both upper
>     extremities. (Listing 1.05C is an exception to this general definition because the
>     individual has the use of only one upper extremity due to amputation of a hand.)
>
> (2) To ambulate effectively, individuals must be capable of sustaining a reasonable
>     walking pace over a sufficient distance to be able to carry out activities of daily
>     living. They must have the ability to travel without companion assistance to and
>     from a place of employment or school. Therefore, examples of ineffective
>     ambulation include, but are not limited to, the inability to walk without the use
>     of a walker, two crutches or two canes, the inability to walk a block at a
>     reasonable pace on rough or uneven surfaces, the inability to use standard public
>     transportation, the inability to carry out routine ambulatory activities, such as

---

[7] The focus of Crowe's argument is on 1.02A.

shopping and banking, and the inability to climb a few steps at a reasonable pace with the use of a single hand rail. The ability to walk independently about one's home without the use of assistive devices does not, in and of itself, constitute effective ambulation.

1.00B2b(1)-(2).

At Step Three, the ALJ stated:

While the claimant's impairments are severe, the record does not specifically establish that the claimant has an impairment that medically meets or equals the severity requirements of any listed impairment.  The undersigned has examined and considered all listed impairments in 20 CFR Part 404, Subpart P, Appendix 1, with specific attention to Listings 1.02 (major dysfunction of a joint) and 1.04 (disorders of the spine).

***[8]

The undersigned has concluded the medical evidence did not demonstrate the claimant's impairments rose to the level of listing level severity, and that no acceptable medical source had mentioned findings equivalent in severity to the criteria of any listed impairment, individually or in combination.

Tr. 24.

Crowe contends that the ALJ's Step Three analysis is insufficient and she argues that there is evidence in the record demonstrating that her impairments meet or equal Listing 1.02 such that the ALJ's failure to provide any analysis requires reversal and remand for further analysis of her impairments at Step Three.

Crowe refers to evidence showing tricompartmental degenerative changes on a 2015 x-ray; chronic knee pain with crepitus; aggravation of knee pain with movement; problems with swelling, stiffness, difficulty ambulating, an antalgic gait, decreased strength, and balance.  Doc. 12, p. 8.  She then asserts in a conclusory manner that the "record contains all of the necessary evidence to document that the requirements of Listing 1.02 have been met."  *Id.*

---

[8] The paragraph not restated herein pertains to the ALJ's discussion of Crowe's obesity.  Tr. 24.

20

The undersigned finds that Crowe has not demonstrated how the evidence upon which she relies shows that she meets Listing 1.02A.  For example, she does not state what the gross anatomical deformity (e.g., subluxation, contracture, bony or fibrous ankylosis, instability) is that shows that her impairments meet or equal Listing 1.02A.  And the evidence shows otherwise. As noted by the ALJ when discussing the medical evidence, during an examination by Dr. Mehta, a rheumatologist, no obvious deformities and no subluxation or ulnar deviation were observed.  Tr. 26, 390.  Additionally, Dr. Mehta observed normal range of motion in all the joints and normal muscle strength in all muscle groups.  Tr. 390.

Crowe also contends that the record shows that she had difficulty ambulating.  Yet, she fails to demonstrate how the evidence shows that her impairments result in the inability to ambulate effectively as described in the listing.  For example, the listing explains that, "Inability to ambulate effectively means an extreme limitation of the ability to walk; i.e., an impairment(s) that interferes very seriously with the individual's ability to independently initiate, sustain, or complete activities.  Ineffective ambulation is defined generally as having insufficient lower extremity functioning (see 1.00J) to permit independent ambulation without the use of a hand-held assistive device(s) that limits the functioning of both upper extremities. . ."  The record, however, reflects that Crowe did not require use of an assistive device.  Tr. 28, 385.  And Crowe has not pointed to evidence to demonstrate that her impairment "interferes very seriously with [her] ability to independently initiate, sustain, or complete activities."

Furthermore, while the ALJ included a limitation in the RFC of no "walk[ing] on uneven terrain[,]" contrary to Crowe's suggestion, this RFC limitation does not demonstrate that "there is no doubt that [she] meets the requirements of paragraph A."  Doc. 12, p. 8.  The listing lists as one example of an inability to effectively ambulate – "the inability to walk a block at a

21

reasonable pace on rough or uneven surfaces."  However, the listing also explains that, "To ambulate effectively, individuals must be capable of sustaining a reasonable walking pace over a sufficient distance to be able to carry out activities of daily living."  Other than pointing to the ALJ's RFC limitation of no walking on uneven terrain, Crowe points to no evidence showing that she is not capable of sustaining a reasonable walking pace over a sufficient distance to carry out activities of daily living.  Rather, as found by the ALJ, Crowe "gardened, babysat her granddaughter, walked to a friend/her sister-in-law's house every day, and did some walking with her sister-in-law." Tr. 28.

Considering the foregoing, the undersigned finds that the decision itself makes clear that the ALJ considered Listing 1.02.  Further, the decision provides a basis upon which the Court can review the Step Three decision.  Having conducted a review of the decision and the evidence of record, the undersigned finds that Crowe has not shown a lack of substantial evidence to support the ALJ's Step Three finding that her impairments did not meet Listing 1.02A.  Nor has she demonstrated how her impairments meet Listing 1.02A.

Additionally, Crowe has not shown a basis upon which reversal and remand should be ordered to assess whether her impairments equal Listing 1.02A.  As stated by the ALJ, "no acceptable medical source had mentioned findings equivalent in severity to the criteria of any listed impairment, individually or in combination."  Doc. 15, p. 5 (citing Tr. 24).  And Crowe points to no medical source who provided findings indicative of medical listing equivalency.

For the reasons discussed herein, notwithstanding the limited discussion at Step Three, the undersigned finds that Crowe has not shown that the ALJ's decision that her impairments do not meet or equal listing level severity is unsupported by substantial evidence.

22

## VI. Conclusion and Recommendation

For the reasons discussed herein, the undersigned recommends that the Court **AFFIRM**

the Commissioner's decision.

September 16, 2019                                    /s/ Kathleen B. Burke
                                                                Kathleen B. Burke
                                                                United States Magistrate Judge

## OBJECTIONS

Any objections to this Report and Recommendation must be filed with the Clerk of
Courts within fourteen (14) days after the party objecting has been served with a copy of this
Report and Recommendation.  Failure to file objections within the specified time may waive the
right to appeal the District Court's order.  See *United States v. Walters*, 638 F.2d 947 (6th Cir.
1981).  *See also Thomas v. Arn*, 474 U.S. 140 (1985), *reh'g denied*, 474 U.S. 1111 (1986).